UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **THE FIRM ADVISORS, LLC** | **CIVIL ACTION NO. 3:23-cv-00602** |
| **VERSUS** | **CHIEF JUDGE TERRY A. DOUGHTY** |
| **TRAINING LOGIC, INC.** **AND DENISE EVANS** | **MAGISTRATE JUDGE MCCLUSKY** |

**COMPLAINT**

NOW INTO COURT comes Plaintiff, The Firm Advisors, LLC ("Firm Advisors"), which, through undersigned counsel, files this Complaint and avers:

**Nature of the Action**

1. This is an action for damages arising from the Defendants' failure to pay Firm Advisors for services rendered in connection with the sale of a business. Firm Advisors dutifully marketed and laid the foundation for the transaction, procuring a buyer that ultimately paid nearly $2,000,000 for the business. Nevertheless, Defendants have, without any basis or justification, refused or failed to pay Firm Advisors' duly earned fee of 7.5% of the sales price.

**Parties**

2. Firm Advisors is a limited liability company. Courtney Sells, a domiciliary of Nebraska, is the sole member of Firm Advisors. Therefore, Firm Advisors is deemed to be a citizen of Nebraska.

3. Defendant, Training Logic, Inc. ("Training Logic"), is a corporation. Training Logic was incorporated in Louisiana and maintains its principal place of business in Ruston, Louisiana. Therefore, Training Logic is deemed to be a citizen of Louisiana.

4. Defendant, Denise Evans ("Ms. Evans"), is domiciled in Ruston, Louisiana.

(Training Logic and Ms. Evans are sometimes collectively referred to hereinafter as "Defendants").

## Jurisdiction & Venue

5.  This Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different States and the amount in controversy exceeds $75,000. Specifically, Firm Advisors seeks to recover its duly earned commission of $144,199.50, exclusive of interest, costs, and attorney's fees.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Training Logic and Ms. Evans reside in this Division of this District. Additionally, or alternatively, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this Complaint occurred in this Division of this District.

## Facts

**A.  The Engagement Agreement.**

7.  Training Logic's business is the provision of employee training services to corporate clients.

8.  Ms. Evans and her late husband, Thomas Evans ("Mr. Evans"), founded Training Logic during their marriage in June 2002. Upon information and belief, Ms. Evans and Mr. Evans owned all of Training Logic's stock (50% each) from founding the corporation through 2022.

9.  On June 18, 2020, Training Logic entered into an Engagement Agreement ("Engagement Agreement") with Firm Advisors. A true and correct copy of the Engagement Agreement is attached hereto as **Exhibit 1**.

10. Under the Engagement Agreement, Training Logic granted Firm Advisors the "sole and exclusive" right to facilitate the sale or disposition of Training Logic's business and agreed to pay Firm Advisors' fee in the amount of 7.5% of the sale price. [Exhibit 1, ¶3].

11. The term of the Engagement Agreement is four (4) months from the effective date of the Engagement Agreement (June 18, 2020), and it continues thereafter until terminated by delivery of written notice (the "Sole and Exclusive Period"). [Exhibit 1, ¶ 4].

12. Firm Advisor's fee under the Engagement Agreement is due upon the occurrence of any of the following events:

   a. Firm Advisors procures a buyer for Training Logic, and the sale closes during the Sole and Exclusive Period [Exhibit 1, ¶3(i)];

   b. Training Logic sells any part of its business or capital shares, regardless of Firm Advisors' involvement, during the Sole and Exclusive Period [Exhibit 1, ¶3(ii)];

   c. Training Logic enters into a contract to sell its business, regardless of Training Logic's involvement, during the Sole and Exclusive Period [Exhibit 1, ¶3(iii)];

   d. Training Logic accepts an offer to sell its business, regardless of Training Logic's involvement, during the Sole and Exclusive Period [Exhibit 1, ¶3(iv)];

   e. Training Logic sells its business within two (2) years following the termination of the Engagement Agreement to a buyer with whom Firm Advisors or Training Logic had any contact during the Sole and Exclusive Period [Exhibit 1, ¶3(v)]; or

   f. Training Logic violates any term of the Engagement Agreement [Exhibit 1, ¶3(vi)].

13. The Engagement Agreement further provides that, in the event of termination, then, for the two (2) years following the date of termination, Training Logic shall notify and provide copies to Firm Advisors of an acceptance of any offer to purchase Training Logic within two (2) days of acceptance, so that [Firm Advisor's] "rights . . . are protected." [Exhibit 1, ¶ 5].

**B.     Firm Advisors' Performance under the Engagement Agreement.**

14. After executing the Engagement Agreement, Firm Advisors immediately undertook performance of the contract, including communicating with Mr. Evans, gathering pertinent information, and preparing and disseminating detailed marketing materials to prospective purchasers.

15. Next, Firm Advisors meticulously vetted prospective purchasers of Training Logic, including interviewing and qualifying more than one hundred eighty (180) candidates over the course of many months.

16. Firm Advisors' efforts yielded sixteen (16) prospective buyers who personally met with Mr. Evans and/or Ms. Evans, and at least nine (9) offers made to purchase Training Logic.

17. One such prospective purchaser procured by Firm Advisors was Wesley Parker ("Mr. Parker"), who contacted Firm Advisors in response to one of its advertisements and requested more information about Training Logic.

18. Firm Advisors first met with Mr. Parker on or about August 6, 2020.

19. Mr. Parker met Mr. Evans on or about August 12, 2020, and Mr. Parker submitted his first purchase offer for Training Logic on or about September 10, 2020.

20. Mr. Parker and Mr. Evans exchanged several communications and offers over the ensuing year. Mr. Parker's latest offer was submitted in or about August 2021.

21. On or about March 26, 2021, Mr. Evans sent an email to Firm Advisors, indicating his intent to terminate the Engagement Agreement. A few days later, however, Mr. Evans sent another email, indicating his openness to continue working with Firm Advisors. Mr. Evans did, in fact, continue working with Firm Advisors after that date, communicating with representatives of Firm Advisors regarding prospective purchasers for Training Logic and dealing with prospective purchasers previously procured by Firm Advisors.

22. Mr. Parker traveled to Ruston, Louisiana to visit Training Logic's facility and met with Mr. Evans on or about July 9, 2021.

23. In or about August of 2021, Mr. Parker notified Firm Advisors that he was withdrawing his offer and was no longer interested in purchasing Training Logic.

24. Mr. Evans died on or about August 26, 2021. Pursuant to Mr. Evans' testament naming Ms. Evans as his universal legatee and the Judgment of Possession rendered in his Succession, Ms. Evans acquired Mr. Evans' 50% of Training Logic's stock, leaving Ms. Evans the sole shareholder of Training Logic.

25. On or about October 14, 2021, Ms. Evans filed a Statement of Change with the Louisiana Secretary of State, listing herself as the registered agent and sole director of Training Logic.

26. Firm Advisors continued marketing Training Logic following Mr. Evans' death. It made numerous attempts to work with Ms. Evans, including presenting multiple purchase offers to Ms. Evans.

27. Unfortunately, however, Ms. Evans ceased all communication with Firm Advisors.

C.  **Sale of Training Logic.**

28.  On March 18, 2022, Accelera Training Logic SPV, LLC ("Accelera") purchased 100% of the outstanding stock of Training Logic from Ms. Evans pursuant to a Stock Purchase Agreement and Bill of Sale (collectively "Purchase Agreement"), true and correct copy of the Purchase Agreement are attached hereto as **Exhibits 2** and **3**.

29.  In the Purchase Agreement, Ms. Evans represented to Accelera that:

> [Training Logic] has no liability or obligation of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) other than liabilities or obligations to the extent shown on the Interim Balance Sheet and current liabilities incurred in the ordinary course of business since the date of the Interim Balance Sheet.
>
> *****
>
> Since December 31, 2019, and except as otherwise noted on the Interim Balance Sheet, the Company has conducted its business only in the ordinary course of business and has not suffered any Material Adverse Change, and no event has occurred, and no circumstance exists, that can reasonably be expected to result in a Material Adverse Change.
>
> *****
>
> "Material Adverse Change" means, with respect to [Training Logic], any event, change, development, or occurrence that, individually or together with any other event, change, development, or occurrence, is materially adverse to its business, condition (financial or otherwise), assets, results of operations, or prospects in an amount in excess of $50,000.00.

[Exhibit 2, Section 3.4 and Exhibit A-Definitions].

30.  Upon information and belief, Training Logic's liability to pay Firm Advisors' fee upon the closing of any sale was not shown on the Interim Balance Sheet or disclosed as a "Material Adverse Change."

31.  Upon information and belief, Mr. Parker is the sole, majority, or controlling member of Accelera.

32.  According to the Purchase Agreement, Accelera paid Ms. Evans $1,922,660.00 for Training Logic's stock.

33. Ms. Evans executed the SPA both personally and as representative of Mr. Evans's estate. Upon information and belief, Ms. Evans was the sole recipient of the sale proceeds.

34. Neither of the parties to the Purchase Agreement notified Firm Advisors of the sale of Training Logic at any time—either before or after the Purchase Agreement closed.

35. Firm Advisors discovered that Ms. Evans sold her stock in Training Logic in early 2023, when an employee of Firm Advisors happened to visit Training Logic's website.

**D.    Defendants Refuse to Pay Firm Advisors' Fee.**

36. On April 7, 2023, upon discovering the sale of Training Logic's stock, Firm Advisors sent a Notice of Breach of Engagement Agreement to Ms. Evans and Training Logic, which, among other things, notifying them that Firm Advisors was entitled to its 7.5% fee.

37. On or about April 20, 2023, following receipt of additional information confirming the full purchase price paid by Accelera for Training Logic's stock, Firm Advisors prepared an amended Closing Invoice showing the fee due and owing to Firm Advisors and delivered it to Ms. Evans and Training Logic. A true and correct copy of Firm Advisors' April 20, 2023, demand is attached hereto at **Exhibit 4**.

38. To date, Defendants have failed or refused to pay any amount to Firm Advisors.

<u>**Alternative Pleadings**</u>

39. To the extent that any of the following counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative as permitted by Federal Rule of Civil Procedure 8(d).

## Count 1: Breach of Contract (Training Logic)

40. Firm Advisors restates and realleges the above facts, allegations, and averments as if fully set forth herein.

41. The Engagement Agreement is a valid and enforceable contract. It is binding upon Training Logic. [Exhibit 1].

42. Firm Advisors fully performed its obligations and procured multiple buyers interested in purchasing Training Logic, including the ultimate buyer, Mr. Parker's company, Accelera.

43. Firm Advisors' services were instrumental in the sale of Training Logic's stock. But for the services rendered by Firm Advisors, Ms. Evans would not have sold the stock in Training Logic to Accelera.

44. The Engagement Agreement was operative and in effect when Ms. Evans sold the stock of Training Logic on March 18, 2022. Even if Mr. Evans terminated the Engagement Agreement in March of 2021, the Purchase Agreement closed within two (2) years of that purported termination. Thus, in any case, Training Logic is entitled to its 7.5% fee.

45. Training Logic breached the Engagement Agreement by, and without limitation: (a) failing to notify Firm Advisors that it had accepted Accelera's offer to purchase Training Logic's stock; and (b) refusing to pay Firm Advisors for its services.

46. As a result, Training Logic is liable to Firm Advisors for, and Firm Advisors is entitled to recover, the full amount of Firm Advisors' fee earned under the Purchase Agreement, in the principal amount of $144,199.50, together with prejudgment interest and court costs incurred in bringing this action.

## Count 2: Breach of Contract (Ms. Evans)

47. Firm Advisors restates and realleges the above facts, allegations, and averments as if fully set forth herein.

48. Ms. Evans did not sign the Engagement Agreement. Instead, Mr. Evans signed as "CEO/President" of Training Logic, representing and agreeing that:

> [Training Logic] is duly authorized to represent all owners, direct or indirect, of [Training Logic], that such owners are bound by the terms and conditions of this [Engagement] Agreement, and the principals of [Training Logic]. . . [Exhibit 1, ¶ 6].

49. The Engagement further provides that, "[t]his Agreement shall be binding upon all parties to this Agreement, their heirs, executors, successors, administrators, representatives or assigns." [Exhibit 1, ¶ 9].

50. At all relevant times, Ms. Evans was an owner, shareholder, and director of Training Logic.

51. Training Logic was an asset of the community of acquets and gains of Mr. Evans and Ms. Evans during their marriage. When Mr. Evans executed the Engagement Agreement on June 18, 2020, Mr. Evans bound the Evans' community to its performance. La. Civ. Code art. 2360.

52. At a minimum, Mr. Evans bound himself for performance of the Engagement Agreement.

53. Following Mr. Evans' death, Ms. Evans became the executrix of his Succession, his universal legatee, and the sole owner and principal of Training Logic. In those capacities, Ms. Evans was bound by the terms of the Engagement Agreement.

54. Ms. Evans availed herself of the benefits of the Engagement Agreement by, without limitation: (a) communicating and entertaining offers to purchase Training Logic's stock from Mr. Parker; and (b) selling Training Logic's stock; and (c) enjoying the proceeds of the sale derived from the Purchase Agreement.

55. The Engagement Agreement was in effect when Ms. Evans sold the stock of Training Logic on March 18, 2022. Even had Mr. Evans terminated the Engagement Agreement on or about March 26, 2021, Training Logic is nevertheless entitled to its 7.5% fee because the Purchase Agreement closed within two (2) years of that purported termination.

56. Ms. Evans breached the Engagement Agreement by, and without limitation: (a) failing to notify Firm Advisors that it had accepted Accelera's offer to purchase Training Logic's stock; and (b) refusing to pay Firm Advisors for its services.

57. As a result, Ms. Evans is liable to Firm Advisors for, and Firm Advisors is entitled to recover, the full amount of Firm Advisors' fee earned under the Engagement Agreement, in the principal amount of $144,199.50, together with prejudgment interest and court costs incurred in bringing this action.

### Count 3: Open Account (Training Logic and Ms. Evans)

58. Firm Advisors restates and realleges the above facts, allegations, and averments as if fully set forth herein.

59. Prior to filing this action, Firm Advisors sent a written demand correctly setting forth the amount owed to Firm Advisors to Training Logic and Ms. Evans.

60. To date, Defendants have failed or refused to pay Firm Advisors any amount for its fee due under the Engagement Agreement.

61. As a result, Defendants are liable to Firm Advisors on open account in the principal amount of $144,199.50, legal interest on all amounts from date of demand, and attorneys' fees should Defendants fail to pay Firm Advisors the amount owed within thirty (30) days from the date demanded, together with court costs incurred in bringing this action, pursuant to Louisiana Revised Statute 9:2781.

### Count 4: Detrimental Reliance (Ms. Evans)

62. Firm Advisors restates and realleges the above facts, allegations, and averments as if fully set forth herein.

63. In the Engagement Agreement, Mr. Evans represented that: (a) Firm Advisors would be paid for its work in procuring a purchaser for Training Logic at the time of closing from the seller's proceeds [Exhibit 1 ¶ 3]; (b) that, in executing the Engagement Agreement on behalf of Training Logic, he was "duly authorized to represent all owners, direct or indirect, of the Business," and that "such owners are bound by the terms and conditions of this Agreement . . ." [Exhibit 1 ¶ 6]; and (c) the Engagement Agreement would be "binding upon all parties to this Agreement, their heirs, executors, successors, administrators, representatives or assigns" [Exhibit 1 ¶ 9].

64. Firm Advisors' reliance on Mr. Evans' representations was reasonable because, and without limitation: (a) Mr. Evans founded Training Logic and was the President of the corporation; and (b) Mr. and Ms. Evans had been married for approximately thirty (30) years, were the sole owners of the business, and had owned it together for approximately twenty (20) years.

65. In reliance upon Mr. Evans' representations in the Engagement Agreement, Firm Advisors invested significant time, energy, and resources over the course of more than one year in

marketing the business, finding a buyer for Training Logic's stock, and otherwise fulling its obligations under the Engagement Agreement.

66. Ms. Evans knew or should have known that the Engagement Agreement requires Training Logic and its directors to pay Firm Advisors' fee if the company's assets or stock were sold within two (2) years after the Engagement was terminated. [Exhibit 1, ¶ 3].

67. As a result, Ms. Evans is liable to Firm Advisors for, and Firm Advisors is entitled to recover, all damages caused by Firm Advisors' reliance on Mr. Evans' representations.

### Count 5: Tortious Interference with Contract

68. Firm Advisors restates and realleges the above facts, allegations, and averments as if fully set forth herein.

69. The Engagement Agreement is a valid and enforceable contract. It is binding upon Training Logic. [Exhibit 1, ¶ 3].

70. As President of Training Logic, Mr. Evans was fully aware and approved of the Engagement Agreement on behalf of Training Logic. Even if he believed that he had terminated the Engagement Agreement in March 2021, Mr. Evans knew or should have known that the Engagement Agreement: (a) imposes a fee due to Firm Advisors for any sale of the business of Training Logic within two (2) years of the termination; and (b) requires Training Logic's directors to notify Firm Advisors within two (2) days of accepting an offer from any buyer. [Exhibit 1, ¶ 5].

71. Firm Advisors introduced Mr. and Ms. Evans to Mr. Parker as a prospective purchaser, and Mr. and Ms. Evans personally met with Mr. Parker when he visited Training Logic's facility in 2021.

72. Upon information and belief, Mr. Evans incorrectly represented to Mr. Parker, during direct negotiations or discussions, that the term of Training Logic's Engagement Agreement

had expired. Upon further information and belief, Mr. Evans' also represented or implied to Mr. Parker that, due to the supposed expiration of the term of the Engagement Agreement, Training Logic was no longer bound under the Engagement Agreement to pay Firm Advisors' fee.

73. Upon information and belief, Mr. Evans' statement induced Mr. Parker and/or Training Logic to breach the Engagement Agreement by completing the stock sale without notifying Firm Advisors or paying its fee.

74. There was no justification for Mr. Evans' interference with the Engagement Agreement. Upon information and belief, Mr. Evans had no corporate authority to misstate material information to Mr. Parker, and Mr. Evans' conduct caused harm to Training Logic in the form of exposing it to: (a) increased costs, in the form of interest and damages on the fee due under the Engagement Agreement; and (b) litigation.

75. For her part, as director and sole owner of Training Logic, Ms. Evans knew or should have known of the existence Engagement Agreement and that it: (a) imposes a fee due to Firm Advisors for any sale of the business of Training Logic within two (2) years of the termination; and (b) requires Training Logic's directors to notify Firm Advisors within two (2) days of accepting an offer from any buyer. [Exhibit 1, ¶ 5].

76. In the Purchase Agreement, Ms. Evans represented and warranted to Accelera that Training Logic had no liability (contingent or otherwise) to Firm Advisors and did not disclose the obligation to pay Firm Advisors as a "material adverse change"—meaning any development or occurrence impacting the condition of the business in excess of $50,000 that had arisen since December 31, 2019.

77. Those representations were inaccurate.

78. Upon information and belief, Ms. Evans' representations in the Purchase Agreement induced Mr. Parker and/or Training Logic to breach the Engagement Agreement by completing the stock sale without notifying Firm Advisors or paying its fee.

79. There was no justification for Ms. Evans' interference with the Engagement Agreement. Upon information and belief, Ms. Evans had no corporate authority to misstate material information to Mr. Parker, and Ms. Evans' conduct caused harm to Training Logic in the form of exposing it to: (a) increased costs, in the form of interest and damages on the fee due under the Engagement Agreement; and (b) litigation.

80. As a result, Ms. Evans is liable to Firm Advisors for, and Firm Advisors is entitled to recover, the full amount of Firm Advisors' damages caused by Ms. Evans' tortious interference with the Engagement Agreement.

### Count 6: Quantum Meruit/Unjust Enrichment (Ms. Evans)

81. Firm Advisors restates and realleges the above facts, allegations, and averments as if fully set forth herein.

82. Firm Advisors provided valuable services to Ms. Evans by marketing Training Logic for sale and producing qualified prospective purchasers for the business.

83. All services provided by Firm Advisors regarding the sale of Training Logic were rendered for the benefit of Ms. Evans, as shareholder and owner of Training Logic.

84. Firm Advisors spent countless manhours marketing the sale of Training Logic, advising Mr. Evans and Ms. Evans and presenting prospective purchasers to them.

85. Firm Advisors procured the ultimate buyer for the sale of Training Logic. Without Firm Advisors, the Purchase Agreement would not have come to fruition.

86. As a direct and proximate result of Firm Advisors' services, Ms. Evans received a financial benefit of not less than $1,922,660.

87. Ms. Evans accepted and enjoyed the financial benefits of Firm Advisors' services.

88. By failing to pay Firm Advisors its duly earned fee, Ms. Evans has been unjustly enriched without cause to Firm Advisors' detriment.

89. As a result, Ms. Evans is liable to Firm Advisors for, and Firm Advisors is entitled to recover, the full value of Firm Advisors' services rendered, together with interest and court costs incurred in bringing this action.

## **Relief Requested**

WHEREFORE, Plaintiff, Firm Advisors, prays for judgment in its favor and against Training Logic and Ms. Evans:

1. Finding that one or both Defendants breached the Engagement Agreement;

2. Finding Defendants liable to Firm Advisors on open account;

3. Finding Ms. Evans liable for tortious interference with the Engagement Agreement; and/or

4. Finding Ms. Evans liable for unjust enrichment or quantum meruit; and

5. Awarding Firm Advisors all damages to which it is entitled, including but not limited to $144,199.50 for its fee due under the Engagement Agreement, with the legal interest at the maximum rate permitted, attorney's fees and all costs incurred in bringing this action; and

6. For any and all additional relief, both legal and equitable, this Court deems proper.

Respectfully submitted,


/s/ *Reid A. Jones*
Reid A. Jones, La. Bar No. 34611
WIENER, WEISS & MADISON
A Professional Corporation
330 Marshall Street, Suite 1000 (71101)
P. O. Box 21990
Shreveport, Louisiana 71120-1990
Telephone: (318) 226-9100
Facsimile: (318) 424-5128
Email: rjones@wwmlaw.com

*Attorneys for Plaintiff,*
*The Firm Advisors, LLC*